**Dorothy PFOTENHAUER, Petitioner,**

**v.**

**Stewart HUNTER, Judge of the District Court of Oklahoma County, Oklahoma, Respondent.**

**No. 48422.**

Supreme Court of Oklahoma.

June 3, 1975.

Robert B. Smith of Miskovsky, Sullivan & Miskovsky, Oklahoma City, for petitioner.

Nanette J. Patton, Public Defenders Office, Oklahoma County, for respondent.

Donald L. Ritter, Consulting Attorney for Dept. of Institutions, Social and Rehabilitative Services, State of Oklahoma, Oklahoma City, amicus curiae.

SIMMS, Justice:

Petitioner, maternal grandmother of a four year old female child, asks this Court to assume original jurisdiction, and seeks prohibition against Respondent Judge to prevent enforcement of an order returning the child to the State of Nevada.

Application to assume original jurisdiction granted. Writ of prohibition issue. Trial court directed to proceed in accordance with the views expressed in this opinion.

Rachel is four years old. At the time of her birth, the name of her father was undisclosed and his identity remains unknown. In 1972, Rachel's natural mother was killed in an automobile accident. In November, 1972, Dorothy Pfotenhauer, Rachel's maternal grandmother and Petitioner herein, petitioned the Eighth Judicial District Court, Las Vegas, Clark County, Nevada, for appointment as guardian of Rachel's person and estate. On November 22, 1972, letters of guardianship over the person and estate of Rachel were issued to Petitioner upon the filing of a $1,000 bond, which was posted.

The manner and the amount of expenditures from the guardianship account eventually led the court to doubt Mrs. Pfotenhauer's ability to manage Rachel's funds in

an acceptable manner and on October 9, 1973, the court appointed Mr. Dennis Sabbath, Esq., to serve as Rachel's attorney in the guardianship proceeding.

On February 6, 1974, Mr. Sabbath filed a petition to increase Mrs. Pfotenhauer's bond to $35,000, alleging, inter alia, that the guardian had received $15,000 on behalf of Rachel and that the money had been expended other than for Rachel's benefit; that the guardian had failed to file an annual accounting; and that the guardian was to receive an additional $15,000, plus certain monthly payments.

In a separate petition he filed the same day, Mr. Sabbath prayed that the ward's grandmother be removed as guardian for the reason that she had "mismanaged" Rachel's estate and further prayed that another person be appointed as guardian of Rachel's person and estate.

Mrs. Pfotenhauer was judicially ordered to appear before the Nevada Court on February 15, 1974, to show cause why she should not be required to post additional bond. The show cause order was personally served upon her on February 11, 1974, however, apparently no proceedings were had on February 15th.

Thereafter, pursuant to court order, a citation was issued to Petitioner directing her to appear in court on March 15, 1974, to show cause why she should not be removed as guardian of the person and estate of the minor child. This citation was not personally served upon Mrs. Pfotenhauer, but rather upon Mr. Marshall, her attorney.

An order of the Nevada District Judge dated April 9, 1974, recites that "the hearing on the *citation* to Dorothy Joan Pfotenhauer * * * to appear and show cause is continued until May 2, 1974; that the matter be referred to the Court Services Department for investigation and report on the fitness of Dorothy to serve as guardian and of the person or agency it would be in the best interest of the minor child for Court to appoint as Guardian;

ordering the Guardian to account on or before April 18; and appointing the Bank of Nevada as Trustee of the estate of Rachel pending the May 2nd hearing."

Dorothy filed her "first and final account" on April 26, 1974. The accounting disclosed that in her capacity as guardian, she had received $15,000 cash from an insurance company and the funds had been placed in a checking account and entirely expended. The cancelled checks for estate expenditures together with some of her personal records, were burned "to keep these estate matters secret and concealed from her husband", whom she divorced shortly after Rachel came to live in her home. That when Rachel came to live with Petitioner, the guardian was without transportation, which "hardship and inconvenience" was relieved by the purchase of a used Mark III Lincoln Continental for $5,800 out of estate monies. That $2,800 was paid to place drapes in the house and $450 was spent on the house so that Rachel could have a bay window to see from while normally confined to the house. That $3,100 of estate funds were expended to carpet the house; $1,300 on furniture, and $425 paid for yard work to improve the "appearance" of the premises; $859 paid for a piano, and a $700 set of encyclopedias was purchased for the then two year old.

Thereafter the matter apparently lay dormant until February 5, 1975, when Mr. Sabbath filed an ex parte application to have the matter set for hearing to determine the status of the case. Attached to the ex parte application was an affidavit by Mr. Sabbath stating that no hearing had been held on his application to remove Mrs. Pfotenhauer as Rachel's guardian. Service of this application was acknowledged by Mrs. Pfotenhauer's lawyer.

On March 7, 1975, Dorothy Pfotenhauer appeared in open court with counsel, in response to Mr. Sabbath's application to determine the status of the case. The transcript of this proceedings reflects that the

report of the Department of Court Services had been received and that it caused grave doubt in the court's mind as to whether or not Mrs. Pfotenhauer should continue to serve in the capacity of guardian of Rachel's person and estate.

At the request of Mrs. Pfotenhauer's counsel, hearing on the matter was continued until March 25, 1975. At the close of the proceedings, the following appears:

"THE COURT: (To Mrs. Pfotenhauer) You keep things the way they are now and I want you back here in court on the 21st, two weeks from today, at 9:00 o'clock, and I will hear from Mr. Marshall at that time and also from Mr. Sabbath or anybody else that has anything to offer. It is a difficult problem. I really don't know what to do.

MRS. PFOTENHAUER: The baby is happy and we are happy.

THE COURT: I am sure she is.

MRS. PFOTENHAUER: I don't know anything else I can do.

THE COURT: You do the best you can and we will come back to court on the 21st, is that understood?

MRS. PFOTENHAUER: Yes."

Mrs. Pfotenhauer failed to appear before the court on March 21st. Within a few days following the March 7th hearing, Mrs. Pfotenhauer had removed herself and Rachel to Oklahoma City, Oklahoma, where they remain at this date.

On April 1, 1975, the District Judge of the Eighth Judicial District Court of Clark County, Nevada, entered an order which revoked the letters of guardianship previously issued to Mrs. Pfotenhauer; made Rachel a ward of the Nevada Court; and ordered the Sheriff of Clark County to take possession of Rachel and to deliver her to the Director of Juvenile Court Service, pending further order of the court.

On April 14, 1975, the same Judge entered a further order containing findings that Rachel had been "spirited" away from the jurisdiction of the Nevada Court and that her welfare was in jeopardy so long as she was in physical control of Mrs. Pfotenhauer. The order reaffirmed the prior order making Rachel a ward of the Nevada Court and directed the utilization of the Interstate Compact on Juveniles, Ch. 214, Nevada Revised Statutes, [10 O.S. 1971, § 531, et seq.] for the purpose of returning Rachel to Nevada.

Complying procedurally with the provisions of the Interstate Compact on Juveniles, the Nevada Juvenile Authority petitioned for a requisition to return the child under the provisions of Art. IV, relating to run-away juveniles. The petition, however, specifically alleged that the guardian had spirited the child from Nevada to Oklahoma City while custody proceedings were pending. Upon receipt of the Nevada requisition, Respondent Judge issued an order directing Oklahoma County peace officers to take Rachel into immediate custody.

Rachel was taken into custody. The staff of the Juvenile Bureau caused a Dependency and Neglect Petition to be filed, thereby invoking the provisions of 10 O.S. Supp.1972, § 1101 et seq. Respondent Judge issued an order placing her temporary custody with the Department of Institutions, Social and Rehabilitative Services, until final determination of the matter. On May 6, 1975, a hearing was held before Respondent at which Petitioner was present in person and by counsel, and Rachel was represented by court appointed counsel. This hearing was styled as one to show cause on the temporary custody order, however, it is clear from reviewing the transcript that the scope of the proceeding was limited to the Interstate Requisition Order.

Petitioner's demurrer to the Requisition and her Motion to Quash same were overruled. She requested a jury trial on the dependency and neglect petition and Respondent set the date of the trial for the

month of September, 1975, and ordered Rachel returned to the State of Nevada in the interim.

Whereupon, Petitioner caused the instant proceedings to be commenced.

Counsel for Petitioner asserts that (1) the order discharging Mrs. Pfotenhauer as guardian and making the child a ward of the Nevada Court is a nullity because Mrs. Pfotenhauer was not personally served with summons prior to discharge as required by Nevada statute; (2) that Rachel does not fall within the provisions of the Interstate Compact on Juveniles and therefore is not subject to the provisions thereof; (3) that the order of Respondent setting the jury trial in September and ordering the child returned to Nevada in the interim effectively deprives Petitioner of her statutory right to trial by jury, provided in 10 O.S.Supp.1972, § 1110.

Suffice it to say that the matter of Rachel Pfotenhauer's custody has become an unprecedented procedural entanglement.

Initially, we must determine whether the Interstate Compact on Juveniles is applicable to the existent circumstances of four year old Rachel. In answering this question, we must bear in mind that the Nevada Court, in its order which terminated the guardianship and made Rachel a ward of that Court, made no finding that Rachel was not under proper supervision and control, nor that she was adjudged to be a delinquent juvenile, nor that she had escaped or absconded, nor that she had run away from home, nor did that Court adjudicate her as a dependent and neglected child.

The Findings and Purposes of the Compact are enumerated in 10 O.S.1971, § 532, Art. I, as follows:

"The cooperation of the states party to this compact is therefore necessary to provide for the welfare and protection of juveniles and of the public with respect to (1) cooperative supervision of delinquent juveniles on probation or parole; (2) the return from one state to another, of delinquent juveniles who have escaped or absconded; (3) the return from one state to another of nondelinquent juveniles who have run away from home; and (4) additional measures for the protection of juveniles and of the public, which any two or more of the party states may find desirable to undertake cooperatively."

■ Respondent urges that Rachel comes within the language "additional measures for the protection of juveniles, etc." Assuming, without conceding, that Rachel falls within this provision, we need but observe that the provisions of the Compact, Articles IV and V, provide for hearings when a Requisition is presented for the return of a juvenile who is alleged to be either a delinquent, run-away, escapee, or absconder. However, no procedural guidelines are set forth pertaining to a hearing regarding this "additional measures" classification in Art. I(4), and a complete hearing has not been provided in the instant case.

We can only conclude that the provisions of the Interstate Compact have no applicability to Rachel. She is neither a runaway, absconder, escapee or juvenile delinquent.

The fundamental requisite of due process is the opportunity to be heard. Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914), and in this instance the procedure based upon the compact was insufficient to meet this minimal standard.

A determination that the Compact does not apply to four year old Rachel does not fully dispose of this cause.

Counsel for Petitioner urges that Mrs. Pfotenhauer is being deprived of her right to a jury trial on the issue of the alleged dependency and neglect occurring in Oklahoma County. The jury trial, above mentioned, was scheduled for September, and Rachel was ordered returned to Nevada pending that adjudication. The only factual allegations enumerated in the Petition

to support the claim that Rachel was a dependent and neglected child were that she was a ward of the State of Nevada and that she had been "spirited away" from that jurisdiction.

Counsel asserts that Petitioner should be afforded an immediate hearing in the nature of habeas corpus wherein she will be able to present evidence not only as to legality and status of the Nevada guardianship action, but also as to any change of conditions which may have occurred subsequent to that action and evidence relevant to protecting and serving the best interests of the infant. We must agree.

When Rachel's custody was taken from Petitioner in Oklahoma County under color of law, she was entitled, as a claimant of her legal custody, to be fully heard at the first possible moment, both as to her asserted legal custody and the best interests of the child.

We do not reach any conclusion as to the legal sufficiency of the Dependency and Neglect Petition and discuss it only because the Petition and the subsequent action based upon it comprise a part of the procedural whole of this matter. We simply observe that the order setting jury trial for September and ordering the child returned to Nevada in the interim is violative of due process under the authority of York, et ux, Petitioners v. Halley, et al., Respondents, Okl., 534 P.2d 363 (1975).

Petitioner's argument that the Nevada Court was powerless to terminate the guardianship because Petitioner was not personally served with the citation as required by 159.185 N.R.S. (Nevada Revised Stat.) is meritless. After her lawyer was served with citation, Mrs. Pfotenhauer voluntarily appeared in open court in response thereto.

If a guardian voluntarily appears without personal service of citation, such service is unnecessary. Deegan v. Deegan, 22 Nev. 202, 37 P. 360; and if the guardian appears in person and by counsel, no further notice is necessary. In re: Guardianship of Chambers, 46 Okl. 139, 148 P. 148. The Nevada District Court therefore had jurisdiction and judicial power to enter the order terminating the guardianship.

Petitioner voluntarily invoked the jurisdiction of the Nevada Court, she sought and obtained letters of guardianship and accepted the trust and responsibility the Court reposed in her to faithfully execute her duties as guardian. She is now estopped from denying that jurisdiction which she invoked. See, Dudding v. Pittman, 138 Okl. 222, 280 P. 801 (1929). Neither is Petitioner able to divest that court of jurisdiction over the guardianship by removing herself and the child from the territorial limits and refusing to return because her removal from Nevada was fraudulent. In Burckhalter et al. v. Conyer, Tex.Civ.App., 285 S.W. 606, it was held that during the pendency of suit involving custody and control of infant, removal thereof by one of parties from state is wrongful, and constructively fraudulent, and becomes actually so if absence from state is purposely contrived when time comes for the ultimate use of that jurisdiction. Such is the instant case.

While being cognizant of the demand of comity and the apparent legality of the order of the Nevada District Court, which, in its exercise of continuing jurisdiction terminated the guardianship it had created, we must, nevertheless, recognize that Petitioner was denied her right to be heard, quickly and completely, in the District Court of Oklahoma County.

This decision should not be interpreted in any manner as diminishing or casting doubt upon the sanctity with which the Nevada judgment must be treated in the Oklahoma courts. At the same time, the rights of Mrs. Pfotenhauer and her claims to the infant's custody must be viewed with the highest regard and afforded every protection by the Court which has taken custody from Petitioner in this State. Under the dictates of our statutes and case law,

Mrs. Pfotenhauer is entitled to far more than she has received to date.

Therefore, we assume original jurisdiction; and prohibit the District Court of Oklahoma County from returning Rachel to the authorities from the State of Nevada until such time as a hearing in the nature of habeas corpus is conducted by the Juvenile Division of the District Court. In this manner, Mrs. Pfotenhauer will be allowed to present such evidence and testimony which is reflective of the best interests of the child, as well as evidence and testimony directed toward the question of the effect of the Nevada judgment. It is further ordered that this hearing be conducted immediately upon Ten Days notice to the parties.

WILLIAMS, C. J., HODGES, V. C. J., and DAVISON, IRWIN, BERRY, LAVENDER, BARNES and SIMMS, JJ., concur.